**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

|  |  |
|---|---|
| **Delta Kappa Epsilon (DKE) Alumni Corporation** ) | **Civil Case No.:** |
| **c/o Philip J. Wolfenden** ) | |
| **66 Wellington Street West** ) | |
| **Suite 4200, Toronto Dominion Bank Tower** ) | **Judge:** |
| **Box 20, Toronto-Dominion Centre** ) | |
| **Toronto, Ontario M5K 1N6** ) | |
| **Canada** ) | |
| ) | |
| **and** ) | |
| ) | |
| **MU of DKE Foundation** ) | |
| **110 Broad Street** ) | |
| **Hamilton, New York 13346** ) | |
| **c/o Thomas P. Halley** ) | |
| **2 Walnut Hill Road** ) | |
| **Poughkeepsie, New York 12603** ) | |
| ) | |
| **and** ) | |
| ) | |
| **Sam Higgins, President** ) | |
| **Local Chapter of Mu of Delta Kappa Epsilon** ) | |
| **108 Broad Street** ) | |
| **Hamilton, New York 13346** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **vs.** ) | |
| ) | |
| **Colgate University** ) | **COMPLAINT FOR** |
| **c/o 13 Oak Drive** ) | **INJUNCTIVE AND** |
| **Hamilton, New York 13346** ) | **DECLARATORY RELIEF** |
| ) | |
| **and** ) | |
| ) | |
| **Rebecca Chopp, President** ) | **JURY TRIAL DEMANDED** |
| **Colgate University** ) | |
| **13 Oak Drive** ) | |
| **301 James B. Colgate Hall** ) | |
| **Hamilton, New York 13346** ) | |
| ) | |
| **and** ) | |

| | |
|---|---|
| **John A. Golden** | ) |
| **Chair, Colgate Trustees** | ) |
| **13 Oak Drive** | ) |
| **301 James B. Colgate Hall** | ) |
| **Hamilton, New York 13346** | ) |
| | ) |
| **Defendants.** | ) |

## I.  INTRODUCTION

Plaintiffs' complaint for injunctive and declaratory relief is based on Colgate's violations of: (1) federal anti-trust law; (2) the Freedom of Speech and Association Campus Act of 1997; (3) the First Amendment of the U.S. Constitution; (4) New York's General Business Law §349; and (5) New York's common law, including: (a) implied contract/public policy; (b) promissory estoppel; (c) adhesion contract; and (d) tortious interference with contractual relations.

Plaintiffs seek a temporary restraining order and preliminary and permanent injunctive relief to stop Colgate from:  (1) requiring that Colgate own the DKE house as a condition of allowing DKE undergraduates to live there and to be recognized as a fraternity; (2) requiring that DKE give Colgate unrestricted access to the DKE library and the right of first refusal to buy the DKE library as a condition of selling the DKE house to Colgate; (3) prohibiting DKE undergraduates who live in university-owned housing from associating and assembling at the DKE house or library if these structures are not sold to Colgate; (4) otherwise denying DKE undergraduates any rights or privileges enjoyed by other Colgate students because DKE has not sold its house or library to Colgate; and (5) prohibiting Colgate from monopolizing, attempting to monopolize, or conspiring to monopolize the market for residential services to students matriculating on campus at Colgate University in Hamilton, New York.  Plaintiffs' declaratory relief seeks a determination that Colgate's conduct is illegal on the grounds listed above.

Colgate's "New Vision for Residential Education" ("New Vision") requires its students to live in university-owned housing. Colgate is using the plan to force DKE to sell its house. It also wants unlimited access to the DKE library and a right of first refusal to buy it. The DKE library is a separate, non-residential facility without windows or a bathroom. If DKE refuses Colgate's demands, Colgate will end 150 years of DKE history at Colgate on March 15, 2005.

Colgate's proposal to buy the DKE house, which contains minimum occupancy requirements and other unrealistic terms, guarantees DKE's eventual failure and ensures that Colgate ultimately will be able to use the house for general student housing. Indeed, so that DKE has no viable option but to accept Colgate's unreasonable terms, Colgate intends to prohibit DKE undergraduates from ever assembling and associating at the DKE house or library if Colgate does not own them, even if the undergraduates live in university-owned housing. This Court's intervention is absolutely necessary to keep this all from happening.

## II. JURISDICTION AND VENUE

1.      This Complaint is filed and this action is instituted under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§15 and 26), for injuries to plaintiffs' business and property by reason of defendants' violation of Section 2 of the Sherman Act (15 U.S.C. §2), and to enjoin the defendants from continuing to commit such violation in the future.

2.      Plaintiffs' claim for relief also arises under the Freedom of Speech and Association Campus Act of 1997, 20 U.S.C. §1011.

3.      This Court has jurisdiction over the federal claims pursuant to 28 U.S.C. §1331 and 1337(a). Jurisdiction over the New York common law pendant claims arises under 28 U.S.C. 1367(a). This Court also has jurisdiction over this action pursuant to the Declaratory Judgment Act, 28 U.S.C. §§2201 and 2202.

4.      Venue is proper here under 28 U.S.C. §1391(b).

## III. PARTIES

5.      Plaintiff, Delta Kappa Epsilon Alumni Corporation (DKE Corporation), is a non-profit corporation that runs and maintains the DKE fraternity house.  The DKE fraternity house provides residential services to Colgate undergraduates who are members of DKE fraternity. DKE recruits men who combine in equal proportions "the gentleman, the scholar, and the jolly good fellow."  Its members engage in expressive association, including blood drives, fundraising, and community action programs.

6.      Plaintiff, MU of DKE Foundation (DKE Foundation), is a non-profit foundation that owns the DKE library next to the DKE fraternity house and owns the DKE house mortgage. The DKE library is a separate building without windows and a bathroom used primarily as a library and an occasional meeting place.

7.      Defendant, Colgate University (Colgate or the University), is a non-profit corporation primarily with an academic purpose.

8.      Defendant, Rebecca Chopp, is Colgate's President who is appointed by Colgate's Board of Trustees and is responsible for the conduct and the well-being of the University.

9.      Defendant, John A. Golden, is Chairman of Colgate's Board of Trustees, which has final authority for the conduct of Colgate.

## IV. STATUTORY AND LEGAL FRAMEWORK

10.     The Sherman Antitrust Act is designed to prevent restraints to free competition in business and commercial transactions which tend to restrict production, raise prices, or otherwise control the market to the detriment of purchasers or consumers.  Section 2 of the Act prohibits

4

monopolization or attempted monopolization of "any part of the trade or commerce among the several States."  15 U.S.C. §2.  Congress intended the antitrust laws to apply to a wide array of commercial conduct so as to foreclose unfair business practices wherever they occur.  No blanket exemption from the antitrust law based on an organization's non-profit status or public-service orientation exists.

11.     The Freedom of Speech and Association Campus Act of 1997 provides that no student attending an institution of higher education on a full or part-time basis should, on the basis of participation in protected speech or protected association, be excluded from participation in, be denied the benefits of, or be subject to discrimination or official sanction under any education program, activity or division of an institution directly or indirectly receiving financial higher education resource and student assistance.  Protected association under the statute means the joining, assembling, and residing with others that is protected under the First and Fourteenth Amendments to the U.S. Constitution, or would be protected if the institution of higher education involved were subject to those amendments.  The term protected speech under the statute means speech protected under the First and Fourteenth Amendments of the U.S. Constitution, or which would be protected if the institution of higher education involved were subject to those amendments.

12.     The First Amendment of the U.S. Constitution protects every citizen's right to engage in expressive association for the advancement of beliefs and ideas.  The U.S. Supreme Court has recognized that a private party cannot rely on state action through the courts to enforce what is otherwise unconstitutional.  *Shelly v. Kraemer*, 334 U.S. 1 (1948).  New York courts have found private parties who receive state funds and are regulated by the state to be, in appropriate circumstances, state actors.  *Ryan v. Hofstra University*, 67 Misc. 2d 651, 662-63 (N.Y. Sup. 1971).

13.     New York's General Business Law §349 creates a private right of action to enjoin deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in the State of New York.  General Business Law §349 applies to colleges and universities.  *Brown v. Hambric*, 168 Misc. 2d 502, 508 (Yonkers Ct. 1995).

14.     New York common law recognizes an implied contract between a student and a university based on public policy, and where an academic institution exercises its discretion arbitrarily or irrationally, judicial intervention is warranted.

15.     New York common law recognizes promissory estoppel where the following elements exist:  (1) a clear and unambiguous promise; (2) reasonable and foreseeable reliance by the parties to whom the promise is made; and (3) an injury sustained and reliance on the promise. Recovery based on promissory estoppel is not dependent on the existence of a contract or the particulars of consideration.  A promissory estoppel action arises out of a breached promise in circumstances under which it is fair to hold the promissor to the terms of the promise.

16.     New York common law will not enforce an adhesion contract.  The elements for a contract of adhesion are: (1) a necessity of life; (2) a contract for the excessive benefit of the offeror; (3) an economic or other advantage of the offeror; and (4) the offer of the proposed contract on a take-it-or-leave-it basis.  A finding of adhesion focuses the inquiry as to whether a particular contract should be denied enforcement on the grounds that it defeats the expectations of the weaker party or it is unduly oppressive or unconscionable.  Unconscionability has generally been recognized to include an absence of meaningful choice on the part of one of the parties together with contract terms, which are unreasonably favorable to the other party.  A contract is unconscionable if it does not result from real bargaining between the parties who have had freedom of choice and understanding and ability to negotiate in a meaningful fashion.

17.     New York common law recognizes tortious interference with a contract where the following elements exist: (1) the existence of a valid contract between a plaintiff and a third party; (2) a defendant's knowledge of that contract; (3) a defendant's intentional procurement of the third-party's breach of that contract without justification; and (4) damages.

## V.  FACTS

### Colgate's Structure

18.     Colgate is a liberal arts academic institution with approximately 2,800 students and 250 faculty.

19.     Colgate's corporate structure is divided into the Board of Trustees, the President, the Academic Administration, and the non-Academic Administration.

20.     The Board of Trustees is a body of thirty-five members.  It has final responsibility for the conduct of the University.

21.     The President of the University is a member of the Board of Trustees.  She is appointed by the Board of Trustees and is responsible to it for the conduct and well-being of the University.

22.     The Dean of the Faculty and Provost is the Chief Academic Officer of the University and has primary responsibility for faculty personnel, curriculum, and supervision of instructional budgets.  He is the Chief Officer of the University in the President's absence.

23.     The Dean of the College has primary responsibility for all matters relating to students and student activities.

24.     The Office of Residential Education is directly in charge of all aspects of the University residence community.

**Interstate Trade and Commerce**

25.     Colgate is engaged in, and the acts and policies described herein, are in and have a substantial effect on, interstate commerce.

          a.     Colgate solicits applications from prospective students throughout the United States, including through use of the U.S. mail.

          b.     Colgate's student body comes from 48 states and 27 countries.

          c.     Colgate receives much of its annual revenues from out-of-state students' tuition.

          d.     Colgate solicits financial contributions from alumni living throughout the United States, including through the use of U. S. mail.

          e.     The services provided by Colgate require Colgate to purchase supplies from outside of the State of New York.

26.     The elimination of competition in the market for residential services for Colgate students matriculating on campus is likely to result in higher prices being charged to such students, including those students whose expenses are paid by a source outside of the State of New York.

27.     Colgate is in the business of providing residential services, including housing, meals and social meeting facilities, to students attending and matriculating at Colgate.  Colgate provides at least 70% of the students' residential services at Colgate.

28.     Colgate advertises its tuition ($31,230), room ($3,680) and board ($3,940) separately.  Colgate's college housing or apartments are $4,100 for a room annually.

29.     Colgate has five main dining locations that provide food:  (1) Frank Dining Hall; (2) The Edge Café; (3) The Coop; (4) Juice Bar; and (5) Donovan's Pub.

30.     Colgate offers six different meal plans:  (1) Premier Unlimited ($3,940); (2) Classic Unlimited ($3,310); (3) 14 Meal Dining Plan ($3,310); (4) 10 Meal Dining Plan ($2,625); (5) 5 Meal Dining Plan; and (6) Value Access at the Coop.

31.     First year Colgate students must choose the Premier Unlimited plan and upper class students living in traditional residence halls must choose either of the Unlimited plans or the 14 meal plan.

32.     Colgate's residence halls include:  (1) Andrews Hall; (2) Bryan Complex (Cobb, Crawshaw, Parke and Russell Houses); (3) Curtis Hall; (4) Cutten Complex (Brigham, Read, Shepardson, and Whitnall Houses); (5) Drake Hall; (6) East Hall; (7) 'Gate House; (8) Stillman Hall; and (9) West Hall.

33.     Colgate University's apartments include:  (1) Newell Apartments (Buildings 1 through 4); (2) Parker Apartments (45 separate apartments); and (3) University Court Apartments (10 buildings with four apartments in each building).

34.     Colgate's college houses include:  (1) Asia Interest House; (2) Bunche House; (3) Creative Arts House;  (4) Cushman House;  (5) Loj;  (6) Harlem Renaissance Center;  (7) French/Italian House; (8) Class of 1934 House; (9) LaCasa Pan-Latina Americana House; (10) 84 Broad Street; (11) 92 Broad Street; (12) 94 Broad Street; and (13) 104 Broad Street.

35.     The current fraternity houses at Colgate include:  (1) Beta Theta Pi; (2) Delta Kappa Epsilon; (3) Delta Upsilon; (4) Kappa Delta Rho; (50) Phi Delta Theta; (6) Sigma Chi; and (7) Theta Chi.  Current sorority houses include:  (1) Delta Delta Delta; (2) Gamma Phi Beta; (3) Kappa Alpha Theta; and (4) Kappa Kappa Gamma.

36.     The Bunche House, located at 80 Broad Street, is the former Lambda Chi Alpha fraternity.

37.     The Creative Arts House, located at 100 Broad Street, is the former Phi Psi fraternity.

38.     The Cushman House, located at 102 Broad Street, is the former Phi Kappa Gamma (Fiji) Annex.

39.     84 Broad Street is the former Sigma Nu fraternity.

40.     92 Broad Street is the former Alpha Tau Omega fraternity.

41.     94 Broad Street is the former Phi Tau fraternity.

42.     104 Broad Street is the former Phi Kappa Gamma fraternity (Fiji).

43.     Colgate also owns the Hamilton Initiative, LLC, a shell corporation that, excluding schools, churches and their related properties, owns most of the main commercial properties in downtown Hamilton, New York.

44.     Colgate's most recent Form 990, Return of Organization Exempt from Tax (Form 990), indicates that it owns the Colgate Inn, Palace Theater Night Club, and Hamilton Theater, all of which are located in Hamilton, New York.

45.     Colgate's Form 990 states its revenues from student tuition and fees are $77,381,140 and $16,983,224 from auxiliary operations.  Revenue from the Colgate Inn is $2,409,021. Colgate also receives federal fund support in excess of $2 million.

46.     The DKE house can accommodate up to 51 student residents.  It operates a kitchen with a cook who provides three meals a day to brothers living in and outside of the house.  Room rate is $2,185 per semester and board is $1,675 per semester.

47.     The residential services for DKE undergraduates are provided through a contract between the DKE Foundation and the DKE undergraduates.

## **Relevant Markets**

48.    For purposes of this action, the relevant geographic market for Colgate's residential services and rental properties is the Village of Hamilton, New York and the immediate vicinity.  Hamilton, New York has a population of 2,500 people, 300 fewer people than Colgate University's student population.

49.    As advertised on Colgate's website, for many years, Colgate has been Hamilton's major industry.  Hamilton has changed little in size or character during the past 100 years.

50.    For purposes of this action, relevant product markets are: (1) the provision of residential services to Colgate students matriculating on-campus; and (2) the ownership and operation of rental properties.

51.    There is no cross-elasticity of supply or demand between residential services for students matriculating on-campus at Colgate and other residential services for the population generally.  There are distinct facilities for residential services for students matriculating on-campus at Colgate from which the general population is excluded.

52.    For the reasons set forth below, among others, Colgate students are unlikely to transfer to another college, and prospective students are unlikely to select a college other than Colgate, in response to increased prices for residential services at Colgate.

      a.    Students select a college or university based on a variety of factors likely to outweigh differences in the cost of residential services, including without limitation, financial aid, price of tuition, reputation of the school, legacy, curriculum and majors offered, location, sports, extracurricular activities and social atmosphere.

      b.    Students entering college tend to have imperfect information regarding the quality and cost of college residential services and how each will change over the four or more years they will spend in college.

      c.     Students enrolled in a college or university are unlikely to transfer to a different school based on the cost of residential services for many reasons, including:

      i.     The large investment of time sunk in researching and applying to the school;
      ii.     Loss of financial aid;
      iii.     Non-transferability of credits;
      iv.     Establishment of relationships with faculty;
      v.     Social ties.

### Colgate's "New Vision" and Restraints of Trade

53.     On July 9, 2003, Colgate Board of Trustees Chairperson, John Golden, announced "A New Vision for Residential Education" for Colgate.  The "New Vision," a residential initiative, was unanimously approved by Colgate's Board of Trustees and publicly endorsed by President Chopp.

54.     The "New Vision" was based on a report done by the Task Force on Campus Culture ("Task Force") over a two-year period.  The Task Force was made up of trustees, faculty, students and administrators.

55.     The "New Vision" will focus on providing students with the skills and experience they will need to become active citizens in a democratic society, to be able to build communities, to understand and work with people different than them, to formulate and express opinions, and to organize and lead group efforts.

56.     As part of the "New Vision," Colgate announced its intention to purchase, and to subsequently operate, all fraternity and sorority housing and other residential services at Colgate. This was allegedly based on the Task Force's recommendations.  Neither the Task Force nor the "New Vision" provides grounds specifically addressing why ownership of Greek-lettered houses is the only option to accomplish its purpose.

57.     All but one of Colgate's fraternities and sororities are on Broad Street in Hamilton, New York, interspersed with university-owned houses that also have and provide

residential services to Colgate students.  Colgate administrators, such as Financial Vice President, David Hale, recognized that Colgate's purchase of the fraternities would be an emotional issue.

58.     Colgate's "New Vision" can continue to be implemented as planned without the sale of the DKE house or library.  Colgate students, including DKE undergraduates, will still be subject to the "New Vision" and all of Colgate's rules and regulations without the sale of the DKE house.

59.     In the fall of 2003, DKE offered Colgate a long-term lease proposal that would allow Colgate to maintain and operate the DKE house.  It also suggested a Colgate resident advisor live in the DKE house.  In a letter dated November 14, 2003, Colgate's Financial Vice-President and Treasurer, David Hale, stated Colgate's rejection of DKE's long-term lease option, and demanded outright ownership of the DKE house as the only option.

60.     Colgate will only recognize DKE if it owns the DKE house and has unlimited access to its library and the right of first refusal to purchase it.  DKE undergraduates will not be allowed to enroll at Colgate in the 2005 academic year if they live in a privately-owned DKE house.  DKE cannot pledge new members if it does not agree to Colgate's terms regarding its house and library.

61.     Colgate will prevent DKE undergraduates from assembling and associating at the DKE library if DKE does not sell its house and grant unlimited access of its library to Colgate.

62.     Colgate's Financial Vice President, David Hale, announced on June 22, 2004 that fraternities that remain privately owned will not be allowed to gather for meals together in their houses, and that the undergraduates who do so will be subject to discipline, including expulsion.

63.     If Colgate does not own the DKE house and have unlimited access to the DKE library, Colgate intends to discipline or expel any DKE undergraduates who associate or

assemble at the DKE house or library, even if the undergraduates live in university-owned housing.

64.     Colgate charges students higher rates for overall residential services than those charged by DKE.

65.     Colgate's $725,000 offer to purchase the DKE house is below-market.   The insurance replacement cost of the DKE house is $1.6 million.

66.     Colgate is presently constructing a new student dormitory on the south end of Broad Street (N.Y. State Route 12B) near the Colgate infirmary.  The facility will accommodate a maximum of 350 upperclassmen in an apartment setting in three separate "quads."

## Effect On Competition

67.     Colgate adopted and is implementing its "New Vision" for the purpose of eliminating competition in the market for student residential services in and around Hamilton, New York, and the policy is having the effect of eliminating competition in such market.

68.     Colgate, on the verge of eliminating competition for student residential services, is and will be able to exercise market power in its pricing and delivery of services to consumers.

69.     The elimination of competition in the market for student residential services will result in higher prices to student consumers for lower quality services.

70.     Despite any non-commercial purpose stated by Colgate to the contrary, the true intent of the "New Vision" policy is commercial, as evidenced by Colgate's refusal to pursue less-restrictive, non-monopolistic means of pursuing Colgate's purported goals, such as a long-term lease of the DKE house, a Colgate resident advisor, and Colgate's insistence upon unlimited access to and the right to purchase the DKE library, which is a non-residential facility.

71.    Colgate's commercial purpose is also demonstrated by its recognition of three non-residential Greek-lettered organizations, Phi Kappa Tau, Delta Delta Delta, and Kappa Kappa Gamma, for which Colgate intends to add to its residential services.  Colgate continues to recognize these three Greek-lettered organizations, for which it intends to provide residential services, but will not recognize DKE if DKE refuses to sell its house to Colgate and provide it unrestricted access to the DKE library.

72.    Colgate's commercial purpose is further demonstrated by Colgate Trustee Howard Ellins's statements to Beta Theta Pi alumnus, Richard Greene, at a Colgate informational reception on or about August 13, 2003, in New York City, regarding the sale of fraternity property to Colgate, that "fraternities have no choice."

73.    Colgate's policy has resulted in Colgate being the sole buyer in the market for rental properties in and around Hamilton, New York, allowing Colgate to make "take-it-or-leave-it" below-market price offers to DKE and other Colgate fraternities and sororities.

74.    The majority of available renters for residential services in Hamilton, New York are Colgate students and other members of the Colgate community who outnumber Hamilton residents.

### Colgate's Promises And Representations To Its Fraternities

75.    As part of its formulation of the "New Vision," the Colgate trustees concluded that fraternities and sororities are an important part of Colgate's history and traditions and promised to preserve them.  The Trustees decided not to eliminate fraternities and sororities at Colgate.

76.    Colgate's "New Vision" acknowledges a strong tradition of Greek-lettered organizations exists at Colgate, dating back to 1856.  It recognizes that Greek-lettered organizations have historically been an integral part of life at Colgate.  Colgate's trustees,

administration, and faculty openly follow these principles.

77.     Colgate's website on fraternities and sororities indicates that joining a Greek-lettered organization is one of the most rewarding commitments one can make in a lifetime.  The site declares that the residential aspect is an integral part of the overall Greek experience.  Colgate's trustees, administration, and faculty openly follow these principles.

78.     Colgate's Operating Principles and Standards for Greek-lettered houses ("OPSG") confirms that fraternity houses are more than physical structures; they embody the traditions, values and history of many of Colgate's alumni, and Colgate promises to be mindful of its role in preserving their culture.   Colgate's trustees, administration, and faculty openly follow these principles.

79.     Colgate's OPSG promises to respect students' rights of privacy.   Colgate's trustees, administration, and faculty openly follow these principles.

80.     Colgate has established a Relationship Statement with its fraternities.  It states that continued recognition of fraternities is based on chapter performance.  Nothing in the Relationship Statement requires Colgate's ownership of a fraternity's residential structure or its library for continued recognition.

## Colgate's Promises To Its Students

81.     Colgate's Student Handbook 2003-05 ("Handbook"), Forward section, promises to inculcate in students Colgate's traditions of community and character in that Colgate is a place where students care about things larger than themselves and where they join and belong.  Colgate's trustees, administration, and faculty openly follow these principles.

82.     Colgate's Handbook promises to reduce the number of rules governing student behavior.

83. Colgate's Handbook, Standards of Conduct and Non-Academic Policies, requires all members of the Colgate community to adhere to local, state and federal laws and regulations. Colgate's trustees, administration, and faculty openly follow these principles.

84. Colgate's Handbook, Policy on Public Order, promises a commitment to the discharge of Colgate's legal and moral responsibilities, especially as they relate to the rights of freedom of speech and peaceful assembly in the University community. Colgate's trustees, administration, and faculty openly follow these principles.

85. Colgate's Handbook, Code of Student's Rights and Responsibilities ("Student Code"), promises a student's right to privacy. It guarantees that nothing in the Residence Hall contract can expressly or implicitly give University officials authority to consent to a search of a student's room by police or other government officials without a warrant authorized by law. Authorization of a search of a student's room in a residence hall by members of the University only occurs to assure compliance with federal, state or local criminal law or University regulation. Colgate's trustees, administration, and faculty openly follow these principles.

86. Colgate's Student Code promises an atmosphere conducive to the full and free expression of opinion and the right to free association. Colgate's trustees, administration, and faculty openly follow these principles.

87. Colgate's Student Code promises that no enumeration of students' rights and responsibilities shall be deemed to conflict with the rights students enjoy and the rightful responsibilities they incur as United States citizens. Colgate's trustees, administration, and faculty openly follow these principles.

88. Colgate's Student Code promises the rights of free inquiry, expression and assembly. Colgate also promises to protect the viability of students' personal and civil rights, including the right to be secure in one's person, speech, living quarters, papers, and effects

against unreasonable search and seizure.  Colgate's trustees, administration, and faculty openly follow these principles.

89.     Colgate's Student Code promises that Colgate will not act in a prejudicial, discriminatory or capricious manner toward students.  Colgate's trustees, administration, and faculty openly follow these principles.

90.     Colgate's Residential Education Handbook 2003-04 ("Residential Handbook"), Community Living, promises residential opportunities and experiences that promote the development of self-governance and independent living.  The Residential Handbook promises a place for everybody in the Colgate community and guarantees that each individual has the right to be unique, to be heard, to be understood, and to be accepted and respected.  Colgate's trustees, administration, and faculty openly follow these principles.

91.     Colgate's Residential Handbook guarantees a student's right to privacy and ensures that no unwarranted intrusion or entry into a student's living space will occur.  The Residential Handbook outlines narrow grounds for University staff to enter a student's living space.

92.     Colgate's "New Vision" includes a Broad Street Community Program ("BSCP") that promises students greater freedom and more responsibility for their residential communities.

93.     Colgate's BSCP establishes that residential living is fundamental to Colgate's Greek-lettered organizations.  Colgate admits that residents in fraternities are best able to form lasting bonds, live according to their founding principles, and pass on traditions and values to new members in this residential setting.  Colgate's trustees, administration, and faculty openly follow these principles.

94.     Colgate's BSCP promises free standing university-owned houses where the residents will select their own peer groups and govern their residences independently within

broad University guidelines.

95.     President Chopp has promised that the BSCP will give students the opportunities they want to live with their friends, to govern themselves, and to create lively and diverse social options.

96.     The foundation of each house in the BSCP is a community vision plan that is a social contract between the students living in the house and Colgate's Office of Residential Education.

97.     President Chopp promised that junior and senior Colgate students in the Broad Street Community can live with a self-selected group of peers that engage in self-governance.


### Colgate's Promises About The DKE Library

98.     On August 14, 2003, at a meeting at the University Club in Manhattan, New York, convened specifically to discuss DKE and the "New Vision," when asked by DKE Foundation Chairman, Thomas P. Halley, whether the DKE library would have to be part of any sale of the DKE house to Colgate under the "New Vision," President Chopp stated emphatically, "Absolutely not!"  Present at this meeting to ratify President Chopp's guarantees were Robert Tyburski, V.P. of Colgate Development, Ruth Ann Loveless, A.V.P. of Alumni Affairs, and Colgate Trustee, Howard Ellins.

99.     The DKE library is a non-residential facility with no windows and no bathroom. It is a separate building on a divisible lot that can be maintained as a separate piece of property.

100.    Colgate insists on terms that include the DKE library as part of the sale of the DKE house.  The terms require unlimited access to the library and a right of first refusal to buy it.  Colgate will not recognize DKE after March 15, 2005 if it fails to agree to these terms.

**Colgate's Contract Of Adhesion**

101.    Colgate's proposals to buy the DKE house and library were made with the condition that DKE undergraduates would not be allowed to live in the DKE house and to enroll at Colgate University if Colgate did not own the DKE house and have unlimited access to the DKE library and a right of first refusal to buy it.  DKE must accept such terms by March 15, 2005.

102.    Colgate's offers to purchase the DKE house and to gain unlimited access to its library were made with the condition of prohibiting DKE undergraduates from associating and assembling at the DKE house and library if DKE did not agree to Colgate's terms, even if DKE undergraduates lived in university-owned housing.

103.    Colgate's offer to purchase the DKE house also included certain 80% and 60% occupancy minimums never required at DKE that if unmet would allow the DKE house to be used for different purposes or even allow Colgate to prohibit DKE undergraduates from further residence in the house.  As a harbinger of things to come, DKE's naming rights on its own house will be reduced to a "memorial" plaque.

**Colgate's Violation of Implied Contract / Public Policy**

104.    Colgate has irrationally and arbitrarily required DKE to sell its house and provide unlimited access to its library as a condition of DKE undergraduates' right to live at the DKE house and to be enrolled at Colgate.

105.    Colgate irrationally and arbitrarily intends to prohibit DKE undergraduates from associating and assembling at the DKE house and library if not university-owned, even if the DKE undergraduates live in university-owned housing.

106.    Colgate has irrationally and arbitrarily refused to accept DKE's long term lease arrangement for the DKE house, or a Colgate resident advisor, in lieu of ownership, even though these terms satisfy all of Colgate's main objectives under the "New Vision" and the BSCP.

**Colgate's Unconstitutionally Unenforceable Contract To Limit Expressive Association**

107.    Colgate's defense of Plaintiffs' action here will require this Court's state action to enforce Colgate's unconstitutional administrative resolution and unilateral contract that prohibit DKE undergraduates from free speech and expressive association at the DKE house and library unless they are university-owned.

108.    Colgate cannot ultimately prohibit through expulsion DKE undergraduates' rights of free expression at a privately owned DKE house or library without the state action of this court's enforcement of these restrictions.

**Colgate's Tortious Interference With Contractual Relations**

109.    The DKE Foundation has residential services contracts with the DKE undergraduates for room and board.

110.    Colgate is aware of these contractual commitments between the DKE Foundation and the DKE undergraduates.

111.    Colgate's requirement that the DKE undergraduates must live in university housing to be enrolled at Colgate in the 2005 academic year has left the DKE undergraduates with no choice but to reject the DKE Foundation's residential services contracts for the 2005 academic year if DKE refuses to sell its house and grant unlimited access of its library to Colgate.

112.    Colgate intentionally has made enrollment at Colgate in the 2005 academic year a condition of the DKE undergraduates' residential options at Colgate to interfere with the residential service contracts between the DKE Foundation and the DKE undergraduates.

113.    Colgate has announced that Greek-lettered organizations that are in good standing and that complete the sale of their properties by March 15, 2005 will be allowed to continue housing in the fall of 2005.  Colgate also has announced that the fraternities that have chosen to retain ownership of their properties will not be allowed to house students in the fall of 2005, and that Colgate will withdraw recognition of their undergraduate chapters in the summer of 2005. Colgate has identified DKE as a fraternity that did not reach agreement on the sale of its property.

## VI. CAUSES OF ACTION

### First Claim for Relief

### Monopolization (Sherman Act, Section 2)

114.    Plaintiffs incorporate herein all of the allegations set forth above as if fully restated here.

115.    Defendants have engaged in the previously described anticompetitive conduct to secure and maintain monopoly and monopsony power in the relevant markets.  As a result of the anticompetitive conduct, Colgate has achieved the power to control prices and willfully exclude competition within the relevant market(s) in violation of the Sherman Act, 15 U.S.C. Section 2 , resulting in injury to the market and to the Plaintiffs as alleged herein.

116.    Colgate's attempt to acquire DKE and other Colgate fraternity and sorority houses is the result of force and coercion and not a consequence of a superior product, business acumen or accident.

**Second Claim for Relief**

**Attempted Monopolization (Sherman Act, Section 2)**

117.    Plaintiffs incorporate herein all of the allegations set forth above as if fully restated here.

118.    By engaging in the acts described above, Colgate has engaged in anticompetitive conduct with the specific intent to acquire monopoly power in the relevant market(s), in violation of Section 2 of the Sherman Act.

119.    There is a dangerous probability that, if left unchecked, Colgate will achieve a monopoly position in the relevant market(s), especially since Colgate admits it is the primary sponsor of business activity in Hamilton, New York.

**Third Claim for Relief**

**Freedom of Speech and Association Campus Act of 1997**

120.    Plaintiffs incorporate herein all of the allegations set forth above as if fully restated here.

121.    Defendants intend to exclude DKE undergraduates from being enrolled at Colgate because of their protected association as DKE members.  Plaintiffs are doing so by requiring the DKE house to be sold to Colgate as a condition of the DKE undergraduates' right to live and to associate there as Colgate students.

122.    Colgate also intends to prohibit DKE undergraduates from expressive association at a privately owned DKE house and library, even if the DKE undergraduates live in university-owned housing.

**Fourth Claim for Relief**

**New York General Business Law §349**

123.    Plaintiffs incorporate herein all of the allegations set forth above as if fully restated here.

124.    As part of its "New Vision," Colgate's trustees concluded that fraternities and sororities are an important part of Colgate's history and promised to preserve them.

125.    Colgate's "New Vision" includes a Broad Street Community Program ("BSCP") that establishes that residential living is fundamental to Colgate's Greek-lettered organizations. Colgate admits that, as residences, fraternities are best able to form lasting bonds, live according to their founding principles, and pass on traditions and values to new members in this residential setting.

126.    Colgate's proposal to purchase the DKE house is intended to ensure DKE's eventual failure.  Colgate's proposal requires various occupancy minimums of 60% and 80% of capacity that if unmet will allow Colgate to kick DKE off campus and to use the DKE house for other purposes.  Historically, even as a private fraternity, DKE has rarely, if ever, been able to meet the occupancy minimums proposed by Colgate.

127.    Colgate's offer to purchase DKE also insists on unlimited access to the DKE library and an option of first refusal to buy it.  This term was intended to elicit a rejection by DKE, thus providing grounds for Colgate to exclude it from the BSCP and withdraw recognition from DKE as a fraternity. This would allow Colgate to use the DKE house for other purposes.

**Fifth Claim for Relief**

**Common Law Implied Contract / Public Policy**

128.    Plaintiffs incorporate herein all of the allegations set forth above as if fully restated here.

129.    Defendants' demand to include unlimited access to and right of first ownership of the DKE library, a non-residential facility, as part of the sale of the DKE house to Colgate, and to prevent the DKE undergraduates from associating in the library unless it is owned by Colgate, is an arbitrary, irrational and bad faith act by Colgate that warrants judicial intervention as a matter of implied contract and public policy.

130.    Defendants' requirement that DKE must sell its house and grant unlimited access to and right of first ownership of its library to Colgate as a condition of the DKE undergraduates' rights to live in the DKE house and to be enrolled at Colgate for the 2005 academic year is an arbitrary, irrational, and bad faith act by Colgate that warrants judicial intervention as a matter of implied contract and public policy.

**Sixth Claim for Relief**

**Promissory Estoppel**

131.    Plaintiffs incorporate herein all of the allegations set forth above as if fully restated here.

132.    Defendants, through President Chopp, have promised that the DKE library would not be part of a sale of the DKE house to Colgate under the "New Vision."

133.    Notwithstanding any documents published by Colgate that disclaim the formation of a contract, or which allow Colgate to modify the terms of the document, Defendants have published numerous documents containing promises, including the "New Vision" document, and

have made numerous public statements, that the "New Vision" is solely a *residential* initiative. Defendants have promised that the sale of a non-residential facility like the DKE library would not be a condition for the DKE undergraduates to live at the DKE house, or to continue to be enrolled at Colgate, or to associate and assemble at the DKE library.

134.    Notwithstanding any documents published by Colgate that disclaim the formation of a contract, or which allow Colgate to modify the terms of the document, Colgate's trustees, administration and faculty have openly followed constitutional principles of due process, free speech, free association, expressive association, privacy, and unreasonable search and seizure with respect to their conduct toward and treatment of Colgate undergraduates.  Colgate's trustees, administration and faculty have openly recognized and honored Colgate students' constitutional and civil rights, even though Colgate is a "private" institution.

135.    Plaintiffs have relied on the Colgate administration's and faculty's promises, representations, and conduct regarding Colgate students' constitutional and civil rights to their detriment and have been injured as a result.

136.    Notwithstanding any documents published by Colgate that disclaim the formation of a contract, or which allow Colgate to modify the terms of the document, Colgate's trustees, President Chopp, and the Colgate administration have recognized and honored the history of fraternities at Colgate since 1856, and have promised to preserve them in a meaningful way.  Yet Colgate has made unrealistic, take-it–or-leave-it proposals to buy the DKE house designed to assure DKE's rejection of Colgate's offer and DKE's eventual demise for not being part of the "New Vision."

137.    Plaintiffs have relied on the Colgate trustees', President Chopp's, and the Colgate administration's promises regarding Colgate's intent to preserve DKE to their detriment and have been injured as a result.

### Seventh Claim for Relief

### Contract of Adhesion

138.    Plaintiffs incorporate herein all of the allegations set forth above as if fully restated here.

139.    The room and board provided by the DKE house is a necessity of college life. Defendants' offer to purchase the DKE house is under-market.  Defendants' offer also conditions the purchase of the DKE house on unrestricted access to and a right of first refusal to buy the DKE library, a non-residential facility.  If DKE does not meet Colgate's terms, DKE is kicked off campus, its undergraduate members cannot live in the DKE house as Colgate students, and they cannot engage in expressive association at the DKE house or library as Colgate students living in university-owned housing.  Colgate's proposals for the purchase of the DKE house are terms for a contract of adhesion that cannot be legally enforced.

### Eighth Claim for Relief

### Tortious Interference with Contractual Relations

140.    Plaintiffs incorporate herein all of the allegations set forth above as if fully restated here.

141.    The DKE undergraduates have a residential services contract with Plaintiffs for room and board.  Defendants are aware of this residential contract.  Defendants are intentionally forcing the DKE undergraduates to breach that contract by conditioning their future enrollment at Colgate upon residency in university-owned housing.  As a result, unless Plaintiffs sell the DKE house to Colgate, DKE undergraduates will no longer be able to enter into contracts with Plaintiffs for residential services at the DKE house.

## VII. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that the Court:

a.      Enjoin Colgate from requiring that it own the DKE house as a condition of allowing DKE undergraduates to live there and to be recognized as a fraternity.

b.      Enjoin Colgate from requiring that DKE give Colgate unrestricted access to the DKE library and the right of first refusal to buy the DKE library as a condition of selling the DKE house to Colgate.

c.      Enjoin Colgate from prohibiting DKE undergraduates who live in university-owned housing from associating and assembling at the DKE house or library if these structures are not sold to Colgate.

d.      Enjoin Colgate from otherwise denying DKE undergraduates any rights or privileges enjoyed by other Colgate students because DKE has not sold its house or library to Colgate.

e.      Enjoin Colgate from monopolizing, attempting to monopolize, or conspiring to monopolize the market for residential services to students matriculating on campus at Colgate University in Hamilton, New York.

f.      Declare that Colgate's "New Vision" that requires DKE undergraduates to live in university-owned housing violates Section 2 of the Sherman Antitrust Act and thus is an anti-competitive and illegal restraint of trade.

g.      Declare that Colgate's "New Vision" that denies DKE undergraduates the right to live in the DKE house or to assemble and associate at the DKE house and library as Colgate students unless the structures are university-owned violates the Freedom of Speech and Association Campus Act of 1997.

h.      Declare that Colgate's "New Vision" that denies DKE undergraduates the right to

live in the DKE house or to assemble and associate at the DKE house and library as Colgate students unless the structures are university-owned violates The First Amendment of the U. S. Constitution, as applied through Colgate's defense relying on the state action of this Court's jurisdiction to enforce otherwise unconstitutional terms of a unilateral contract.

i.      Declare that Colgate's "New Vision" that denies DKE undergraduates the right to live in the DKE house or to assemble and associate at the DKE house and library as Colgate students unless the structures are university-owned violates the implied contract between a private university and its students recognized by New York's common law in that Colgate's requirements are irrational, arbitrary and in bad faith.

j.      Declare that Colgate's "New Vision" that denies DKE undergraduates the right to live in the DKE house or to assemble and associate at the DKE house and library as Colgate students unless the structures are university-owned illegally proposes an unenforceable contract of adhesion.

k.      Declare that Colgate is estopped from denying DKE undergraduates the right to live in the DKE house or to assemble and associate at the DKE house and library unless the structures are university- owned because of binding representations and promises by President Chopp and Colgate administrators who made binding promises to honor students' constitutional and civil rights in a private setting.

l.      Declare that Colgate is estopped from requiring that DKE provide Colgate unrestricted access to its library and a right of first refusal to buy the library as a condition of the sale of the DKE house based on binding promises made by President Chopp that DKE need not do so.

m.      Declare that Colgate is estopped from requiring DKE to agree to any proposal to sell the DKE house and library under terms that DKE reasonably believes threaten its future

existence.

  n.  Declare that DKE undergraduates shall not be denied any rights and privileges of

other Colgate students based on whether DKE sells its house or library to Colgate.

  o.  Provide Plaintiffs with their attorneys' fees in this action.

  p.  Grant such other relief as the Court deems just and proper.


Dated:  February 25, 2005

             Respectfully submitted,

             Thomas J. Wiencek (#0031465)
              twiencek@brouse.com
             Brouse McDowell, LPA
             388 South Main Street
             Suite 500
             Akron, Ohio 44311-4407
             (330) 535-5711, ext. 337
             Fax:  (330) 253-8601


             _____

             Peter D. Carmen (#501504)
              pcarmen@mackenziehughes.com
             W. Bradley Hunt (#512811)
              bhunt@mackenziehughes.com
             Mackenzie Hughes LLP
             101 South Salina Street, Suite 600
             P. O. Box 4967
             Syracuse, New York 13221-4967
             Telephone:  (315) 233-8386
             Fax:  (315) 474-1216

             *Counsel for Plaintiffs*