**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

─────────────────────────────

**DELTA KAPPA EPSILON (DKE)**
**ALUMNI CORPORATION, MU OF DKE**          5:05-CV-245
**FOUNDATION, and SAM HIGGINS,**              (GLS/GJD)

                    **Plaintiffs,**

            **v.**

**COLGATE UNIVERSITY, REBECCA**
**CHOPP, and JOHN A. GOLDEN,**

                    **Defendants.**

─────────────────────────────

**APPEARANCES:**                    **OF COUNSEL:**

**FOR THE PLAINTIFFS:**

BROUSE, McDOWELL LAW FIRM     THOMAS J. WIENCEK, ESQ.
388 South Main Street
Suite 500
Akron, Ohio 44311

MACKENZIE, HUGHES LAW FIRM     WILLIAM B. HUNT, ESQ.
101 South Salina Street
Suite 600
Syracuse, New York 13221-4967

CONSTANTINE, CANNON LAW FIRM     DOUGLAS E. ROSENTHAL,
1627 Eye Street N.W.                          ESQ.
Suite 100
Washington, D.C. 20006

**FOR THE DEFENDANTS:**

BOND, SCHOENECK LAW FIRM          EDWARD R. CONAN, ESQ.
One Lincoln Center
Syracuse, New York 13202-1355

HUGHES, HUBBARD LAW FIRM          GEORGE A. DAVIDSON, ESQ.
1 Battery Park Plaza
New York, New York 10004

**Gary L. Sharpe**
**U.S. District Judge**

## AMENDED MEMORANDUM-DECISION AND ORDER

## I. Introduction

The Delta Kappa Epsilon fraternity and its Hamilton, New York

chapter maintain that Colgate University's new residential program violates

federal and state law.[1]  Specifically, DKE alleges that Colgate possesses a

monopoly in the market for residential services in Hamilton, New York, in

violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

After Colgate filed a motion for summary judgment pursuant to

Federal Rule of Civil Procedure 56, *see Dkt. No. 35*, the court held a

hearing, heard oral argument, and reserved decision.  *See Dkt. No. 60.* For

the reasons that follow, Colgate's motion is granted in its entirety.

## II. Facts

---

[1]For ease of reference, the court collectively refers to plaintiffs as
"DKE" and defendants as "Colgate."

2

### A.    The Parties

Colgate is a highly select liberal arts college located in Hamilton, New York.  *See Colgate SMF ¶1*; *Dkt. No. 35.*  Colgate's corporate structure is divided into the Board of Trustees, the President (Chopp), the academic administration, and the non-academic administration.  *See id.*  Delta Kappa Epsilon Alumni Foundation is a non-profit corporation that formerly operated the fraternity house of DKE fraternity on the Colgate campus. *See id.* at *¶2.*

### B.    "The New Vision"

On November 11, 2000, four young people died after an intoxicated, underage DKE member crashed his car into a tree on Colgate's campus. *See Colgate SMF ¶3*; *Dkt. No. 35.*  In response to this deadly tragedy, Colgate sought to reorganize residential life, tailoring its residential life program to support its liberal arts goals and to protect the health and safety of Colgate students.  *See id.*  The Colgate Board of Trustees established a Task Force on Campus Culture composed of trustees, faculty members, students, and administrators.  *See id.* at *¶4.*

On July 9, 2003, the Colgate Board of Trustees announced its "New

Vision for Residential Education" at Colgate.[2]  *See id.*  As part of the New

Vision, Colgate would require all students to live in University-owned

housing.[3]  *See Colgate SMF ¶5*; *Dkt. No. 35.*  The New Vision also

encompassed the Broad Street Community Program for juniors and

seniors.  *See id.* at ¶7.  This program provided upperclassmen with the

opportunity to live in houses and apartments on Broad Street, the historical

location of most off-campus housing at Colgate.  *See id.*  Off-campus

_____

[2]DKE points out that when Colgate first introduced its New
Residential Program, it had a number of current and anticipated major
capitol projects.  *See DKE SMF ¶43; Dkt. No. 50.*  According to a Colgate
publication, Colgate had one of the smallest endowments and lowest total
resources for its students in its liberal arts peer group.  *See id.* at *¶45.*
When the New Residential Program was announced in 2003, the Dean of
Colgate announced that the college could not afford to build new
residential halls for the next 10-12 years.  *See id.* at *¶45.*  However, there
were several problems with University-owned housing, including
overcrowding, structural problems, and bug infestations.  *See id.* at *¶48.*
The Dean felt that without new townhouses, Colgate would lack sufficient
space to house students.  *See DKE SMF ¶48; Dkt. No. 50.*  After learning
that the new townhouses would cost over $15 million, the townhouse
project was restructured.  *See id.* at *¶50.*
     Colgate analyzed the per bed value and the bed capacity for each of
the ten unrenovated Greek-letter houses.  The average per bed value was
calculated as $14,620 per bed, and there were 390 total beds counted
among the ten Greek-letter houses.  *See id.* at *¶¶54, 55.*

[3]For their first two years, undergraduates would be required to live in
traditional residence halls and participate in specially-designed extra-
curricular programs intended to ease the transition into college life.  *See
Colgate SMF ¶6; Dkt. No. 35.*

housing included University-owned residences and fraternities.[4]  *See id.*

Shortly thereafter, Colgate announced its intention to purchase and operate all fraternity and sorority housing and residential services at Colgate.  *See Colgate SMF ¶11*; *Dkt. No. 35.*  Based upon an independent financial firm's appraisal of each property, Colgate offered to  purchase all of the chapter houses at fair market prices.[5]  *See id.*  Negotiations ensued between Colgate and the owners of the respective chapter houses.[6]  *See id.* at *¶12*.  Ultimately, in each instance, Colgate's purchase offer increased over the appraised value.[7]  *See id.*

---

[4]The New Residential Program did not abolish fraternities and sororities at Colgate. *See id.* at *¶9.*  To the contrary, the Board of Trustees expressly communicated its desire to retain the Greek houses.  *See id.*

[5]The fraternity houses would provide Colgate with 398 beds in a prime location near campus.  *See DKE SMF ¶11; Dkt. No. 50.*  DKE maintains that Colgate's purchase of the Greek houses proved to be an inexpensive way of minimizing residential housing costs, expanding Colgate's residential services to students, and strengthening its presence and influence in the local residential market.  *See id.*

[6]Colgate's offer for the DKE house was $725,000.00.  *See DKE SMF ¶55; Dkt. No. 50*.

[7]The terms of acquisition included separate agreements granting each selling fraternity or sorority the right to reacquire its chapter house from Colgate under special circumstances, namely, if Colgate were to eliminate the Greek system or permanently withdraw its recognition of the respective fraternity or sorority.  *See Colgate SMF ¶12; Dkt. No. 35.*

Because DKE opted not to participate in the New Residential Program, Colgate instantly withdrew its recognition of the local DKE chapter.  *See Colgate SMF ¶15*; *Dkt. No. 35.*  Consequently, DKE was prohibited from pledging new members.  *See id.*  Since there were no undergraduates residing in the DKE house when recognition was withdrawn, DKE students were permitted to enroll for the 2005-2006 academic year.  *See id.*

## C.   Colgate's Costs

The total cost incurred by a student attending Colgate is similar to the total cost incurred by students attending other highly select colleges with which Colgate competes.[8]  *See id.* at *¶25.*  These costs[9] include room and board rates, which are also comparable to the room and board rates at

---

[8]In 2003-2004, Colgate's total cost was $37,095, while the cost at Bowdoin was $37,790, Cornell was $38,253, Dickinson was $35,825, Hamilton was $37,560, and Tufts was $38,233.  *See Colgate SMF ¶25; Dkt. No. 35.*

[9]DKE argues that Colgate's figures are not accurate because they do not reflect the following variables: (1) the separate rate of housing only, (2) the differences in the quality of the room, and (3) the differences in the actual discounts students receive through financial aid, scholarships, and grants.  *See DKE SMF ¶26; Dkt. No. 50.*

colleges within Colgate's peer group.[10]  *See Colgate SMF ¶26; Dkt. No. 35*.

In setting its prices, Colgate considers the total student charges at the other top 25 private liberal arts colleges and separates its competitors into "Reference Group 1" and "Reference Group 2."  *See id.* at *¶28.* Colgate also considers the total amount of student charges at the colleges with which it shares the highest number of cross-admissions.[11]  *See id.* at *¶29.*  Colgate maintains that it cannot raise its prices above competitive levels without losing price-sensitive students to other colleges.  *See id.* at *¶30.*  DKE denies this assertion, claiming that financial aid removes financial concerns from the college selection process for most students and that students base their decisions on academic concerns alone, generally

---

[10]In 2003-2004, Colgate charged $7,155 for room and board, while Bowdoin charged $7,670, Cornell charged $9,529, Dickinson charged $7,360, and Tufts charged $8,640.  *See Colgate SMF ¶25; Dkt. No. 35*.

[11]DKE claims that Colgate does not specifically compare national room prices of its peer schools in determining room prices.  *See DKE SMF ¶37; Dkt. No. 50*.  DKE maintains that the increased total student charges for 2003-04 and 2004-05 have instead been based on increases tied to the guidelines of the trailing two-year per capita disposable income figures.  *See id.* at *¶40.*  DKE points out that the increased price for room and board in the 2004-05 academic year was 1.5% higher than Colgate's increase in its tuition price.  *See id.* at *¶41.*  Although this fact is indeed in dispute, it is irrelevant to the court's analysis of the pending motion.

choosing to enroll in the institution with the highest academic rating.  *See DKE SMF ¶30; Dkt. No. 50.*

## D.   The Market of Highly-Selective Colleges

As a highly select, private liberal arts college, Colgate competes with dozens of similar institutions nationwide to attract and enroll top high school students.[12]  *See Colgate SMF ¶17; Dkt. No. 35*.  Colgate maintains that an applicant's decision to enroll in a particular college is based on a cluster of competing factors, including academic quality, cost, geographic location, physical facilities, and student life.  *See id.* at *¶20*.  Conversely, DKE denies that college applicants consider all of these factors equally.  *See DKE SMF ¶20; Dkt. No. 50.*  DKE maintains that the college-bound student instead considers these attributes in a hierarchy of preferences, and housing is not at the top of students' concerns.  *See id.*  Alternatively, DKE maintains that Colgate's academic reputation is the most important

---

[12]According to Colgate's expert, Professor Jerry Hausman, Colgate is one of 70 colleges in the country considered to be the most competitive.  *See Colgate SMF ¶18; Dkt. No. 35* (citing *Hausman Decl. ¶¶6-8*).  Colgate competes with Amherst, Bates, Bowdoin, Brown, Colby, Dartmouth, Davidson, Hamilton, Haverford, Lafayette, Middlebury, Swarthmore, Tufts, Wellesley, Wesleyan, Vassar, and Williams.  *See id.*  Colgate applicants also apply to Middlebury, Bowdoin, Williams, Dartmouth, Bucknell, Cornell, Boston College, Tufts, Yale, Hamilton, Brown and Amherst.  *See id.* at *¶19.*

factor to college applicants.  *See id.* at ¶*21*.

Although the reasons for the change are sharply disputed, it is undisputed that Colgate has become a more desirable college since implementing the New Residential Education Program.  *See Colgate SMF ¶24; Dkt. No. 35.*  In fact, the number of applications for admission to Colgate in 2005 increased from 2004 by 22%, while there was only a 3.8% average increase in applications to a sample of 29 of Colgate's competitor colleges.  *See id.*

## E.   Expert Proof

### 1.   Dr. Jerry A. Hausman

In support of its motion, Colgate relies on the declaration of its expert, Jerry A. Hausman, Ph.D., an economics professor at Massachusetts Institute of Technology.  *See Hausman Decl. ¶3; Dkt. No. 35, Ex. 6.*  Hausman defines the relevant market as the market for highly select colleges throughout the United States.  *See id.* at ¶¶*6, 7.*  In addition, he concludes that DKE's definition of the relevant market, namely, the residential student housing market in Hamilton, New York, ignores both the competition Colgate faces from other colleges and the inability of students to separately purchase education and residential services.  *See id.* at ¶*8*.

9

Hausman opines that a high school student's decision to enroll in a particular undergraduate institution takes into account a variety of factors, including, academic quality, cost/financial aid, geographic location, physical facilities, athletic programs, and student life. *See id.* at ¶*9*. As such, Hausman maintains that college applicants' decisions are usually well-informed and guided by a plethora of information. *See Hausman Decl. ¶3; Dkt. No. 35, Ex. 6.*

Hausman cites three economic factors as evidence that the relevant product market consists of highly select colleges in the United States. *See id. at ¶16*. First, Hausman claims that consumer behavior supports Colgate's definition of the relevant market. *See id.* He maintains that college-bound seniors typically apply to between six and ten colleges, and students admitted at Colgate in 2004 were accepted at an average of 5.6 colleges. *See id.* This behavior, Hausman maintains, demonstrates a high degree of substitution or cross-elasticity among a large number of colleges. *See Hausman Decl. ¶16; Dkt. No. 35, Ex. 6*.

Second, Hausman points out that Colgate competes with other highly select colleges to enroll the "best" applicants. *See id.* at ¶*17.* Each college wants to maximize the attributes of its entering class by enrolling students

with high SAT scores and grade point averages, special talents or skills, and diverse backgrounds.  *See id.*  Colleges that enroll the "best" students are viewed as more attractive to potential students, creating an effect which Hausman calls a "positive externality."  *See id.*  Colgate only enrolls 33% of the students it admits, and Colgate's new residential program seeks to improve Colgate's product attributes in a pro-competitive way.  *See Hausman Decl. ¶19; Dkt. No. 35, Ex. 6.*  Hausman maintains that Colgate's new residential program has proven effective demonstrated by the 22% increase in applications for the 2005 academic year from the previous year. *See id.* at *¶20.*

The third factor Hausman maintains supports Colgate's definition of the relevant product market is the cost of college attendance.  *See id.* at *¶21.*  Hausman points out that Colgate and its peers charge very similar fees for the cost of attendance.  *See id.*  Because of the rigorous competition between highly select colleges, if Colgate were to raise its prices above competitive levels, it would lose students to other colleges. *See Hausman Decl. ¶23; Dkt. No. 35, Ex. 6.*

Based on these economic factors, Hausman concludes that Colgate and its highly select peers are competing in the same market, namely, the

market for highly competitive colleges in the United States.  With this definition of the relevant market in mind, Hausman concludes that Colgate does not possess market power and is one of a large number of colleges with comparable attributes.  *See id.* at *¶¶32-38.*

### 2.    Dr. William S. Comanor

DKE relies on the declaration of its expert, William S. Comanor, Ph.D., an economist and Professor of Economics at the University of California, Santa Barbara.  *See Comanor Decl. ¶1; Dkt. No. 50, Ex. 15.* Comanor defines two sets of economic markets that are relevant to the antitrust issues presented by this case.  *See id.* at *¶9.*  Comanor agrees with Hausman that there exists a market for educational services provided by highly select, liberal arts colleges in the Northeast.  *See id.*  In addition, he recognizes an important aftermarket, namely, the market for housing services of the type typically required by university students in Hamilton, New York.  *See id.*  Comanor opines that students enrolling in Colgate are "locked-in" to the housing market in Hamilton, New York since residential services in Hamilton are not interchangeable with residential services

supplied elsewhere.[13]  *See Comanor Decl. ¶28; Dkt. No. 50, Ex. 15.*

Indeed, eighty-five percent of Colgate students live within ten minutes of

campus.  *See id.*  Comanor maintains that because students provide the

overwhelming share of the demand for housing in Hamilton, there is a

single market for residential spaces in Hamilton.  *See id.* at *¶33.*

Several factors support Comanor's designation of the single

residential market in Hamilton.  For example, rental rates are typically

comparable to the rates established for University-owned, dormitory

housing, and rent is typically set on a per-semester basis rather than on a

per-month basis.  *See id.* at *¶¶30, 34.*

Comanor maintains that Colgate's market definition ignores potential

differences in the quality of University-owned residential housing, including

whether the particular room is a single, double, or triple.  *See Comanor

Decl. ¶44; Dkt. No. 50, Ex. 15*.  Comanor agrees with Hausman that

---

[13]Comanor cites various reasons to support his conclusion that a lock-in effect applies to Colgate students.  First, he points out that current students were unaware of Colgate's plan to change its residential policies and require the ownership of the Greek-letter properties.  *See Comanor Decl. ¶59; Dkt. No. 50, Ex. 15.*  Second, Comanor claims that it is extremely difficult to transfer from one elite liberal arts college to another because financial aid commitments are not easily transferable.  *See id.* at *¶60.*

students shop around when deciding which college to attend.  However, he

disputes that the sticker prices cited by Hausman are the actual prices

college students pay since financial aid and scholarships often offset the

total price of attending college.  *See id.* at *¶¶48-52*.

Instead, Comanor maintains that each college in Colgate's peer

group offers highly differentiated products which confer individualized

status and prestige on their graduates.  *See id.* at *¶52*.  As such, Comanor

maintains that college applicants base their decisions on rankings and

prestige, and rarely does a prospective student select a less prestigious

institution based on housing when a more prestigious alternative is

available.[14]  *See id.*  He explains that there is a hierarchy of preferences,

and certain attributes, such as ranking and cost, are more important to

applicants than others.[15]  *See Comanor Decl. ¶44; Dkt. No. 50, Ex. 15*.

_____

[14]Comanor observes that if Colgate's designated market definition
truly included educational services that were highly substitutable, then
none would attend higher priced institutions when lower priced alternatives
were available.  *See Comanor Decl. ¶54; Dkt. No. 50, Ex. 15*.

[15]To illustrate his point, Comanor cites a survey of prospective
Colgate students who provided information on admissions and the
characteristics that lead them to either enroll or not enroll at the University.
*See id.* at *¶65*.  As part of the survey, Colgate gathered information on the
ultimate enrollment of both all Colgate students and all high-achieving
students admitted to both Colgate and a number of other highly select

14

Comanor compares Hausman's suggested economic model, the "neoclassical model,"[16] with his own "lexicographic model."[17]  *See id.* at *¶65.*  Under the lexicographic model, a Colgate applicant considers Colgate's academic reputation first and foremost, and housing is merely a secondary consideration.  *See id.*  Comanor argues that since housing is a secondary concern to student consumers, Colgate would have no market drive in the national college housing market.  *See id.* at *¶¶66-68.*

Finally, Comanor compares the economic issues presented by the current litigation to the issues confronted by the Supreme Court in *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451 (1992).  In that case, the Supreme Court accepted the "aftermarket theory," holding that Kodak's absence of market power in the primary market did not preclude

_____

liberal arts colleges.  *See id.*

[16]The "neoclassical" model of market analysis states that consumers (here, prospective Colgate students) base their product selection on a host of factors, and each factor weighs in the consumer's product choice. In other words, students looking at Colgate would consider several factors, including academic reputation, housing, extracurricular activities, and college services.

[17]The "lexicographic" model suggests that there are primary concerns that weigh more heavily on a consumer's product choice and secondary concerns that are less significant.

Kodak's improper exercise of market power in the "aftermarket" for replacement parts.  *See id.*  Comanor maintains that Kodak's supply of complex photographic equipment is the analog of Colgate's educational services, while Kodak's supply of sales and services in the equipment aftermarket is analogous to Colgate's supply of residential services.  *See Comanor Decl. ¶72; Dkt. No. 50, Ex. 15*.  As such, he concludes that Colgate competes in two markets, a primary market for educational services and a secondary aftermarket for residential services.  *See id.* at *¶78*.

### III. <u>Discussion</u>

**A.**    **<u>Standard of Review - Motion for Summary Judgment</u>**

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986) (citing FED. R. CIV. P. 56(c)); *Globecon Group, LLC v. Hartford Fire Ins. Co.*, 434 F.3d 165,170 (2d Cir. 2006) (citation omitted).  All reasonable inferences must be drawn in favor of the nonmoving party.  *See Allen v. Coughlin,* 64 F.3d

77, 79 (2d Cir.1995).  The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*,  477 U.S. 317, 323 (1986) (citation omitted); *see also SEC. v. Kern*, 425 F.3d 143, 147 (2d Cir. 2005).  "A 'genuine' dispute over a material fact only arises if the evidence would allow a reasonable jury to return a verdict for the nonmoving party."  *Dister v. Cont'l Group*, *Inc.*, 859 F.2d 1108, 1114 (2d Cir. 1988) (citation omitted).  However, "[c]onclusory allegations, conjecture and speculation...are insufficient to create a genuine issue of fact."  *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

Moreover, "[t]o survive a motion for summary judgment, an antitrust plaintiff must produce economically plausible evidence supporting the elements of its claim."  *Harrison Aire, Inc. v. Aerostar Int'l, Inc.*, 423 F.3d 374, 380 (3d Cir. 2005).  "If the plaintiff's theory is economically senseless, [and] no reasonable jury could find in its favor,...summary judgment should be granted."  *Id*. (citing *Eastman Kodak Co.*, 504 U.S. at 468-69).

**B.**    **Section 2 of the Sherman Act**

17

Colgate argues that DKE's complaint fails to state a claim for relief

under Section 2 of the Sherman Act.  Specifically, Colgate argues that it

lacks monopoly power in the relevant market.  15 U.S.C. § 2 provides:

> [e]very person who shall monopolize, or attempt to monopolize, or
> combine or conspire with any other person or persons, to monopolize
> any part of the trade or commerce among the several States, or with
> foreign nations, shall be deemed guilty of a felony, and, on conviction
> thereof, shall be punished by fine not exceeding   $100,000,000 if a
> corporation, or, if any other person, $1,000,000, or by imprisonment
> not exceeding 10 years, or by both said punishments, in the
> discretion of the court.

15 U.S.C. § 2 .  "The phrase, 'any part of the trade or commerce' as used

in Section 2 has been interpreted by the Courts to refer to the 'relevant

market' which the defendant is monopolizing or attempting to monopolize."

*Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton Coll.*, 106 F. Supp.

2d 406, 411 (N.D.N.Y. 2000) (citation omitted).

"To establish a claim for monopolization, plaintiff must show '(1) the

possession of monopoly power in the relevant market and (2) the willful

acquisition or maintenance of that power as distinguished from growth or

development as a consequence of a superior product, business acumen, or

historic accident.'"  *Heerwagen v. Clear Channel Communications*, 435

F.3d 219, 226 (2d Cir. 2006) (citing *PepsiCo, Inc. v. Coca-Cola Co.*, 315

F.3d 101, 105 (2d Cir. 2002)).  Monopoly power is defined as "the power to control prices or exclude competition...and is also referred to as a high degree of market power[.]"  *Id.* (internal quotation marks and citation omitted).  To succeed on their claims, plaintiffs must show that defendants have "engaged in improper conduct that has or is likely to have the effect of controlling prices or excluding competition, thus creating or maintaining market power."  *Id.* at 226-27 (citing *PepsiCo*, 315 F.3d at 108).

"Evaluating market power begins with defining the relevant market." *Geneva Pharm. Tech. Corp. v. Barr Laboratories, Inc.*, 386 F.3d 485, 496 (2d Cir. 2004).  "The relevant market is defined as all products reasonably interchangeable by consumers for the same purposes, because the ability of consumers to switch to a substitute restrains a [defendant']s ability to raise prices above the competitive level."  *Id*. (internal quotation marks and citation omitted).  Moreover, the relevant product market includes the geographic market in which it is alleged that defendants possess a monopoly.  *See PepsiCo, Inc.*, 315 F.3d at 105.

The plaintiff carries the burden of defining the relevant product market.  *See Hamilton*, 106 F. Supp. 2d at 411.  "When identifying the relevant market, plaintiffs must include all reasonably interchangeable or

substitutable products."  *Id*.  "A market must comprise not [the]

commodities reasonably interchangeable by a particular plaintiff, but

commodities reasonably interchangeable by consumers for the same

purposes."  *Id*. (citing *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124

F.3d 430, 438 (3d Cir. 1997)).  "Interchangeability implies that one product

is roughly equivalent to another for the use to which it is put; while there

may be some degree of preference for the one over the other, either would

work effectively."  *Id*. (internal quotation marks and citation omitted).

"Reasonable interchangeability is also indicated by cross-elasticity of

demand between the product itself and substitutes for it."  *Id.* (internal

quotation marks and citation omitted).  This includes "the purposes for

which they are produced - - price, use and qualities considered."  *PepsiCo,*

315 F.3d at 105 (internal quotation marks and citation omitted).  Moreover,

"[p]roducts will be considered to be reasonably interchangeable if

consumers treat them as acceptable substitutes."  *Id*. (internal quotation

marks and citation omitted).

     "Whether a relevant market has been identified is usually a question

of fact; however, in some circumstances, the issue may be determined as a

matter of law."  *Apani Southwest, Inc. v. Coca-Cola Enterprises, Inc.*, 300

F.3d 620, 628 (5th Cir. 2002).  For example,

> [w]here the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient, and a motion to dismiss may be granted.

*Id.* (citing *Queen City Pizza,* 124 F.3d at 436 (affirming the district court's dismissal of an antitrust claim for failure to plead a relevant market because the definition of the proposed market was too narrow); *TV Communications Network, Inc. v. Turner Network Television, Inc.*, 964 F.2d 1022, 1025 (10th Cir. 1992) (upholding the district court's dismissal of a claim for failure to plead a relevant market where the alleged market consisted of only one specific television channel)); *see also Hamilton*, 106 F. Supp. 2d at 407 ("Although market definition is generally a question of fact, the issue can be decided as a matter of law.").

DKE defines the relevant market as the Hamilton Student Residential Housing Market (HSRHM).[18]  Colgate's definition of the relevant market encompasses the national market of elite liberal arts colleges in which

---

[18]In its papers, DKE also refers to the relevant market as "the provision of residential services to Colgate students matriculating on campus."

Colgate competes for highly qualified applicants.  The facts in *Hamilton*

*Chapter of Alpha Delta Phi, Inc. v. Hamilton* are identical to the facts here.

*See id.*  In that case, four fraternity associations connected with Hamilton

college alleged that the college had a monopoly in the market for

residential services in Clinton, New York when it required all students to

live in college housing.  *See id.*

In rejecting the fraternities' definition of the relevant market as "the

market for residential services for students matriculating at Hamilton

college," the *Hamilton* court held that their definition was "too narrow to

take into account the ability of prospective students to choose to enroll

elsewhere."  *Id*. at 412.  The *Hamilton* court explained that the fraternities'

proposed definition fails to "include all reasonably interchangeable or

suitable products."  *Id.*  Moreover, the court reasoned that Hamilton College

"demonstrated that the relevant market...must be sufficiently broad to

encompass all colleges which are 'reasonably interchangeable' with

Hamilton and that, therefore, plaintiffs' proposed market definition is

incorrect as a matter of law."  *Id.* at 413.

In support of its market definition, DKE relies on the landmark case,

*Eastman Kodak Co. v. Image Technical Services*, 504 U.S. 451 (1992), for

22

its assertion that Colgate has a monopoly in the HSRHM "aftermarket."

*Kodak* addresses the issue of market definition and market power in a

context in which a plaintiff is locked-in to a relationship with a defendant.

*See id.*  In *Kodak*, the plaintiffs established triable issues of fact concerning

the existence of a tying arrangement[19] in which Kodak consumers were

locked-in to an aftermarket for Kodak parts and services when they

purchased Kodak photocopiers and micrographic equipment in the primary

market.[20]  *See id.*  The Supreme Court ultimately held that a tying

arrangement existed and noted that the parts market was separate and

_____

[19]"A tying arrangement is an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier."  *Kodak*, 504 U.S. at 461.  The tying arrangement was apparent since Kodak controlled nearly 100% of the parts aftermarket and 80% to 95% of the service market.  *See id.*

[20]Historically, Kodak's customers had been able to obtain copier repair service from independent service companies that charged substantially less than Kodak.  *See id.* at 457.  When Kodak changed its aftermarket policy to sell replacement parts only to those customers who also purchased Kodak service, Kodak customers were essentially locked-in to a lasting consumer relationship with Kodak.  *See id.*  In other words, Kodak manipulated its power in the replacement parts aftermarket to "squeeze the independent service providers out of the repair market and to force copier purchasers to obtain service directly from Kodak, at higher costs."  *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 440 (3d Cir. 1997).

distinct from the service market.[21]  *See Kodak*, 504 U.S. at 456-57.  The

*Kodak* court then considered whether there was appreciable economic

power in the tying market.  *See id.* at 466.  Specifically, the court

considered "whether competition in the equipment market will significantly

restrain power in the service and parts markets."  *Id.* at 470. The evidence

supported a reasonable inference of monopoly power in the relevant

aftermarket and precluded summary judgment.  *See id.* at 469-77 (citing

evidence of supracompetitive pricing, Kodak's dominant share in the

relevant aftermarket, and high "switching costs" that served to lock in

Kodak's aftermarket customers).

  "In broad terms, *Kodak* stands for the proposition that market reality

is the touchstone of antitrust analysis.*"  Harrison Aire, Inc.*, 423 F.3d at

383.  As stated, the decision in *Kodak* clarifies the relationship between an

_____

  [21]The *Kodak* court pointed out that "because service and parts for
Kodak equipment are not interchangeable with other manufacturers'
service and parts, the relevant market from the Kodak equipment owner's
perspective is composed of only those companies that service Kodak
machines."  *Kodak,* 504 U.S. at 482.  As is articulated in *Hamilton* and
*Hack*, there are interchangeable options and substitutes for Colgate in the
college housing market.  *See Hamilton Chapter of Alpha Delta Phi, Inc. v.
Hamilton Coll.*, 106 F. Supp. 2d 406, 411 (N.D.N.Y. 2000); *Hack v.
President & Fellows of Yale Coll.*, 237 F.3d 81 (2d Cir. 2000) (abrogated
on other grounds by *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)).

appropriately alleged market and aftermarket, holding that "primary market competition does not necessarily preclude monopoly power in the relevant aftermarket where a unilateral policy change targets 'locked-in' customers." *Id*.

Significantly, however, *Kodak* does not transform every possessor of a dominant share in the relevant aftermarket into a monopolist. *See id.* Indeed, "[t]o create a triable question of aftermarket monopoly power, the plaintiff must produce 'hard evidence dissociating the competitive situation in the aftermarket from activities occurring in the primary market.'" *Id*. (citing *SMS Syst. Maint. Services, Inc. v. Digital Equip. Corp.*, 188 F.3d 11, 17 (1st Cir. 1999)).

In analogizing the current litigation to the facts in *Kodak*, DKE argues that Colgate students are "locked-in" to college housing options once they choose to enroll and matriculate at Colgate University.  In other words, DKE agrees with Colgate that college applicants shop for highly select colleges in a *primary* market.  However, DKE maintains that the relevant market for the purposes of this litigation is the "*aftermarket*," which DKE defines as the Hamilton Student Residential Housing Market.  DKE's main complaint is that Colgate exercises an impermissible and monopolistic tying

arrangement with its students in that aftermarket.

DKE maintains that once students are locked-in to Colgate, they cannot leave and choose from a myriad of available alternatives.  In other words, having a substantial investment in continuing to attend Colgate University, a student could not feasibly transfer to another college as a result of an increase in housing costs or a decrease in housing quality.[22] As the *Hamilton* court remarked in regard to this very argument, this assertion, "even if true... is not material."  *Hamilton*, 106 F. Supp. 2d at 413. "Any housing constraints experienced by students who have chosen to enroll despite the residential policy flow from their implied contract [with Colgate] to comply with its rules, including the residential policy."  *Id.*

The Second Circuit has previously visited this very issue.  In *Hack v. President & Fellows of Yale College*, 237 F.3d 81 (2d Cir. 2000), plaintiffs, Orthodox Jewish students who objected to the co-educational residential situation, alleged that Yale's mandatory on-campus housing requirement was impermissibly "tied" to their education in violation of Section 2 of the

---

[22]DKE next argues that Colgate's policy was a pretext for the economic purpose and effect of foreclosing competition in a commercial housing market.  Even if this is true, DKE still fails to define a legally sufficient relevant market.  Thus, this argument is unpersuasive.

Sherman Act.  *See id.* at 86.  The *Hack* plaintiffs argued that Yale had sufficient economic power in the educational market to coerce their payment for college housing and monopolize the New Haven student housing "aftermarket."  *See id.*

When considering this argument, the Second Circuit examined the uniqueness of a Yale education, noting that "uniqueness [of a product] can provide sufficient market power to compel a buyer to purchase a product he would not purchase in a competitive market."  *Id*.  The Circuit explained that "[w]here uniqueness is alleged, questions of market definition and market power will inevitably blend together[.]..."  *Hack,* 237 F.3d at 86; *see also Town Sound and Custom Tops, Inc. v. Chrysler Motor Corp.*, 959 F.2d 468, 479 (3d Cir. 1992) ("If a defendant offers a unique and nonreplicable product,...other products may not be adequate substitutes for it, and hence are not part of the same market.").  In rejecting plaintiffs' tying arrangement claim and recognizing the relevant market as the market for highly select colleges, the Circuit concluded that a Yale education was not unique since it competed with many institutions of higher learning.  *See id*. at 86 (citing as evidence the annual rankings of colleges and universities in *U.S. News and World Report*).

In fact, in citing Yale's residential policy as part of the complete Yale educational package, the Circuit observed that "[i]f...plaintiffs...were dissatisfied with the Yale parietal rules, they could matriculate elsewhere." *Id*. at 86-7; *see also Hamilton*, 106 F. Supp. 2d at 412 ("Prospective students who do not find Hamilton's housing policy attractive are free to choose to attend a different college.").  Moreover, the Circuit observed that

> if a parietal rule requiring some students to reside in college or university housing runs afoul of the antitrust laws, it has largely escaped the notice of the many colleges and universities across the country that have had and continue to have those rules and the notice of the millions of students who have attended those institutions in the more than a century since the Sherman Act was enacted.

*Id*. at 85.  The court also explained that "[e]conomic power derived from contractual arrangements affecting a distinct class of consumers cannot serve as a basis for a monopolization claim."  *Id*.

Here, Colgate and its students enter into a unique contractual arrangement which governs both parties' conduct during the tenure of their relationship.  It is undisputed that "a number of colleges with which [Colgate] competes to enroll high school graduates provide functionally similar educational offerings and have the potential to take significant numbers of students away from [Colgate]."  *Hamilton*, 106 F. Supp. 2d at

28

412.  In fact, just as colleges are competing with their peers to enroll the

best applicants, high school students also face tough competition in

seeking admittance into a highly select college like Colgate.  Once potential

Colgate students receive their offers of admission, they compare and

contrast their options, weighing a cluster of factors, such as academic

reputation, location, sporting facilities, and student diversity.  Indeed,

students may consider housing among other factors in ultimately choosing

a college.

Once a student decides to enroll in a particular college, a unique and

distinctive relationship commences between school and student that

governs that student's four-year tenure.  Over the next four years, an

undergraduate student lives and studies in a "quasi-parented" environment,

where the school, *in loco parentis*, creates and enforces policies for the

protection and welfare of its students.  Here, Colgate has exercised these

rights, namely, its "parietal" rights, *see Hack*, 237 F.3d at 85, in creating a

residential policy that is part of a Colgate education.  As such, the court

holds, as a matter of law, that Colgate's residential policy is an effect of the

exercise of its lawful and appropriate parietal rights.

Alternatively, DKE maintains that the Rule of Reason should govern

this motion, and the court should allow discovery to ensue.  The Rule of

Reason governs most antitrust cases.  *See Capital Imaging Associates,*

*P.C. v. Mohawk Valley Med. Associates, Inc.*, 996 F.2d 537, 543 (2d Cir.

1993).  "Under this test, plaintiff bears the initial burden of showing that the

challenged action has had an *actual* adverse effect on competition as a

whole in the relevant market[.]"  *Id*.  Then, "the burden shifts to the

defendant to offer evidence of the pro-competitive redeeming virtues of

their [alleged monopolistic actions]."  *Id.*  "Assuming defendant comes

forward with such proof, the burden shifts back to the plaintiff to

demonstrate that any legitimate collaborative objectives proffered by

defendant could have been achieved by less restrictive alternatives, that is,

those that would be less prejudicial to competition as a whole."  *Id.*  Here,

DKE must *still* define a legally sufficient relevant market.  *See Maris Distrib.*

*Co. v. Anheuser-Busch, Inc.*, 302 F.3d 1207, 1216 (11th Cir. 2002) ("[A]s a

threshold matter under the rule of reason, a plaintiff must establish that the

defendant had market power in a well-defined relevant market, and that

market power is the ability to raise price significantly above the competitive

level without losing all of one's business.").

As stated, DKE limits the residential services market to the Town of

Hamilton and its immediate vicinity.  This is not sufficient to satisfy the first

element of a Sherman Act violation.  Moreover, Colgate's residential policy

is an appropriate outcome of the exercise of its parietal rights.  As the

*Hamilton* court previously held and this court now affirms, DKE's definition

of the relevant market fails as a matter of law.  Accordingly, none of DKE's

arguments prevail, and Colgate's motion for summary judgment is granted.

### C.   **State Law Claims**

The Second Circuit has consistently held that "in the usual case in

which all federal-law claims are eliminated before trial, the balance of

factors to be considered under the pendent jurisdiction doctrine - judicial

economy, convenience, fairness, and comity - will point toward declining to

exercise jurisdiction over the remaining state law claims."  *Valencia ex. rel.*

*Franco v. Lee*, 316 F.3d 299, 305 (2d Cir. 2003).  DKE articulates no

compelling reason for the court to retain jurisdiction over its state law

claims, nor do the balance of factors weigh in favor of such a holding.

Accordingly, DKE's state law claims are dismissed.

## V. **Conclusion**

Based on the parties' oral arguments, the written submissions, and

the relevant law, the court concludes that DKE's market definition is

incorrect as a matter of law.  It has not satisfied its burden of defining an appropriate relevant market, nor has it proven, in the alternative, that it has a viable antitrust claim based on another market definition.  Accordingly, DKE fails to state a claim for relief under the Sherman Act, and Colgate's motion for summary judgment is granted in its entirety.

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that Colgate's motion for summary judgment is **GRANTED**; and it is further

**ORDERED** that DKE's complaint is **DISMISSED IN ITS ENTIRETY**; and it is further

**ORDERED** that the Clerk provide a copy of this Decision and Order to the parties.

**IT IS SO ORDERED.**

July 2, 2007
Albany, New York

Gary L. Sharpe
U.S. District Judge